UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIM. ACTION NO. 3:22-00054-01 |
| VERSUS | JUDGE TERRY A. DOUGHTY |
| ALLEN BLOUNT (01) | MAG. JUDGE KAYLA D. MCCLUSKY |

### REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a motion to suppress [doc. # 27] filed by Defendant, Allen Blount. For reasons stated below, it is recommended that the motion be DENIED.

### Background

In March 2021, the Monroe Police Department ("MPD") received information that Allen Blount ("Blount") was selling narcotics, specifically heroin. After arranging two controlled buys with Blount, the MPD obtained an arrest warrant for Blount on July 21, 2021. For the next three months, however, the MPD was unable to locate Blount.

On October 14, 2021, task force agents with the Drug Enforcement Agency ("DEA") in Baton Rouge, Louisiana, discovered, via an overlapping wiretap investigation, that an individual was on his way to Monroe, Louisiana, to harm Blount. Because of the imminent threat to Blount, the DEA submitted an exigency request for continuous location monitoring to Blount's cell phone provider. The DEA forwarded the threat and location monitoring information to the MPD.

The next day, on October 15, 2021, the MPD used the location monitoring information to trace Blount to a residence at 3210 Dick Taylor Drive, Monroe, Louisiana. When the MPD arrived at the residence, they observed Blount on the front porch and arrested him, largely

without incident. The MPD then conducted a protective sweep of the residence. During the sweep, the officers observed items that became the basis for a search warrant that they obtained and executed that same day.

On March 9, 2022, a federal grand jury returned a three-count indictment against Blount for (1) making counterfeited and forged obligations, 18 U.S.C. § 471; (2) possession of counterfeited and forged obligations, 18 U.S.C. § 472; and (3) possession with intent to distribute controlled substances, 21 U.S.C. § 841(a)(1). The indictment also sought forfeiture of the contraband. Blount was arraigned on March 24, 2022, whereupon he entered a plea of not guilty.

On August 31, 2022, Blount filed the instant motion to suppress [doc. # 27] all evidence seized pursuant to the October 15, 2021 search and seizure of the residence at 3210 Dick Taylor Drive, Monroe, Louisiana.[1] He also seeks to suppress any incriminating statements or evidence derived therefrom. The Government filed its initial response to the motion on September 14, 2022. (Gov.'t Opp. [doc. # 29]). Following delays for a hearing that began on November 8, 2022 and concluded following a lengthy recess on March 22, 2023, plus post-hearing briefing, the matter is now before the court.[2]

**Relevant Testimony, Audio, and Documentary Evidence**

Two witnesses testified at the combined one and one-half hour-long hearing – both called by the Government: Seth Eppinette and Paul Marionneaux. The Government also introduced all six exhibits, which were accepted into evidence. [doc. #s 34 & 53]. The first exhibit

---

[1] According to the motion, "[o]nce inside the house, agents allege they observed several sheets of paper with the front portion of $100.00 bills copied on them, and wet cut sheets of counterfeit money drying in the kitchen, with a liquid." (M/Suppress, pg. 2 [doc. #27]).

[2] The hearing was continued to allow the Government to obtain information and evidence from the investigation in Baton Rouge.

2

consists of a July 21, 2021 arrest warrant, the associated affidavit in support of the warrant, and a July 21, 2021 bail order. (Gov.'t Exh. 1 [doc. # 34]). The second exhibit is an October 14, 2021 exigent request form addressed to T-Mobile. (Gov.'t Suppl Exh. 1 [doc. # 53]). Exhibits three through six are four audio recordings and rough transcripts of wiretap phone calls between a monitored individual and third parties. (Gov.'t Exhs. 3-6 [doc. # 53]).

The court summarizes relevant testimony and evidence, as follows:

Seth Eppinette ("Eppinette") is a 13-year veteran of the MPD, who has been assigned to the Metro Narcotics Unit for the past two years. (Hearing Transcript, pg. 3 [doc. #s 49 & 54]) (hereinafter abbreviated as "Tr." followed by the page number). Eppinette made two narcotics purchases that were facilitated by Blount and had obtained an arrest warrant for him. (Tr. 5).

**I.     The Arrest Warrant**

Eppinette completed an arrest warrant application on or about July 21, 2021, wherein he averred that on March 3, 2021, he had received information that Blount was selling narcotics, specifically, heroin. (Affidavit for Arrest Warrant; Gov.'t Exh. 1[doc. #34]). On March 3, 2021, Eppinette utilized a confidential informant ("CI") to exchange U.S. currency for 1.3 grams of raw heroin. *Id.*[3] On March 8, 2021, Eppinette again contacted the CI to conduct a controlled buy of heroin from Blount. *Id*. Blount told the CI to come to the Parkview Apartments, where the heroin transaction was completed between the CI and Blount's brother, Standish, who acted on Blount's behalf. *Id*.

On April 30, 2021, a crime lab report confirmed that the substances purchased by the CI contained fentanyl and heroin. *Id*. Eppinette also represented in the affidavit that Blount had a

---

[3] Officer Eppinette has a video of the March 3 transaction and a recorded phone call from the March 8 transaction. (Tr. 20).

3

long criminal history of narcotic sales, plus 11 counts of armed robbery and 11 counts of first-degree murder. *Id.*[4]

On July 21, 2021, the Honorable Scott Leehy of the Fourth Judicial District Court for the Parish of Ouachita, State of Louisiana, issued an arrest warrant for Blount for violations of Louisiana Revised Statute § 40:966.A (heroin); Louisiana Revised Statute § 40:979 (conspiracy); and Louisiana Revised Statute § 40:967.A.1 (fentanyl). (Arrest Warrant).

## II. The Exigency Ping Request

After the arrest warrant issued, Eppinette and the MPD were unable to locate Blount for the next three months. (Tr. 7, 19). They tried about seven or eight times to locate him, without success. (Tr. 27). On the hearing's first day on November 8, 2022, Eppinette testified that, on an unspecified date in October, the MPD received information that a hit had been placed on Blount's life and that the hitman was on his way from New Orleans. (Tr. 6, 8). Eppinette explained that they obtained a "ping warrant" to locate or track Blount via his electronic devices because of the hit and because they were trying to locate Blount to serve the arrest warrant. (Tr. 8).

Eppinette's initial characterization and description of the ping request was inaccurate. There was no warrant. When the court reconvened the suppression hearing on March 22, 2023, Eppinette testified, admitting that Paul Marionneaux ("Marionneaux") of the Baton Rouge Drug Enforcement Agency ("DEA") task force, had been the person who had obtained Blount's location pursuant to an exigent request issued to the cellular provider, T-Mobile.[5] *See* Tr. 43;

---

[4] As it turns out, Blount only had been charged with eleven counts of attempted murder and four counts of armed robbery. (Tr. 23). Eppinette further conceded during cross-examination, that Blount had been convicted of only one count of armed robbery and one count of attempted first degree murder. (Tr. 24-25).

[5] Eppinette offered no explanation for his prior testimony that he personally sought and obtained

4

Exigent Request Form; Gov.'t Suppl. Exh. 1 [doc. #53]).   Another DEA task force officer, Seth Cox ("Cox"), relayed Blount's location to Eppinette from the information provided by Marionneaux.   (Tr. 44-45).

Marionneaux is a twenty-one-year veteran of the DEA Task Force in Baton Rouge.   (Tr. 55-56).   As part of an investigation in the Baton Rouge area, Marionneaux was monitoring communications of an individual when he heard that person threaten to harm Blount.   (Tr. 56-57).   The monitored communications indicated that the individual either was going to kill Blount or cause him great bodily harm.   (Tr. 61-62).   According to one of the recorded calls, the individual threatened to shoot Blount.   *See* Gov.'t Exh. 4.   In addition, the individual was en route to Monroe.   (Tr. 61-62; Gov.'t Exh. 6).   The individual discussed his intention to visit Blount in Monroe in monitored conversations that the individual had with other persons.   *See* Gov.'t Exhs. 3-6.

Because of the imminent threat to Blount's safety, Marionneaux applied to T-Mobile to ping Blount's phone's location.   *See* Tr. 62.   Marionneaux already knew Blount's cell number but did not recall knowing that there was a warrant for his arrest.   (Tr. 71, 76-77).

According to the document itself, the T-Mobile Exigent Request Form was completed by Marionneaux on October 14, 2021.   (Exigent Request Form).   Marionneaux requested continuous location monitoring of the subject phone for 15-minute intervals for 48 hours because of credible information that a death threat had been made against the carrier of the phone and that an act had been taken in furtherance thereof.   *Id*.   As a result, the phone carrier provided ping updates every fifteen minutes to an email address provided by law enforcement.   (Tr. 65-66).   There is no judicial oversight for this type of request.   (Tr. 67).

---

a ping "warrant."   (Tr. 25, 28).

Marionneaux's partner had the Louisiana State Police interdict the individual while he was en route to Monroe. (Tr. 62-63, 72). Marionneaux stipulated that the individual was arrested between noon and 10:00 p.m. on the 14th and had a weapon in the car. (Tr. 73-75). Marionneaux does not think that he ever told the MPD that the individual had been intercepted. *Id*. Marionneaux's decision to obtain the exigency ping information negatively impacted the Baton Rouge investigation. (Tr. 63-64).

Eppinette did not recall whether they received the information that Blount's life was in danger on October 14 or October 15. (Tr. 48-50). Marionneaux provided Cox with a link that they could click to learn Blount's cell phone's location as a GPS coordinate, which derived from triangulation provided by cell towers. (Tr. 48-50, 68, 70). It took 15 to 25 minutes to pinpoint Blount's cell phone location. (Tr. 50). In response to additional questioning, Eppinette later agreed that they most likely received information regarding Blount's cell phone location on October 14, but he was not arrested until the afternoon of the 15th. (Tr. 53). Marionneaux agreed. *See* Tr. 69-70. Eppinette explained that the reason for the overnight delay in seeking to arrest Blount was for officer safety; i.e., so they could gather enough officers to effect the arrest safely in the day time. (Tr. 54).

Eppinette never told Blount that someone was coming to kill him. (Tr. 50-51). Some time after Blount had been taken into custody, Eppinette learned that the person who had been intending to harm Blount had been intercepted and taken into custody. (Tr. 51-52).

### III.    The Arrest

The ping data enabled Eppinette to locate Blount at 3210 Dick Taylor, Monroe, Louisiana, on October 15, 2021. (Tr. 8). In addition to Blount, a "Mr. Wright" also was found at the location. (Tr. 9). Eppinette had never been to that residence before that date. (Tr. 19). He later learned that the residence belonged to Blount's sister. (Tr. 28). The MPD deployed

approximately nine officers to execute the arrest warrant at 2:15 p.m.  (Tr. 17, 29).  This number of officers was not unusual because they needed to ensure that they had enough personnel in case problems arose.  *Id*.

When the officers arrived, they observed Blount and Mr. Wright on the porch in front of the door.  (Tr. 9).  Eppinette and the other officers advised Blount that they had an arrest warrant for him.  *Id*.  As the officers tried to handcuff him, Blount attempted to pull away and to discard narcotics.  *Id*.  After he threw a bag of drugs to the ground, Blount became compliant and was handcuffed.  (Tr. 10).

### IV.     The Protective Sweep

According to Eppinette, officers either placed Blount in the back of a police unit, where he remained as the agents/officers entered the house, or they entered the house and conducted the protective sweep "once Mr. Blount was placed in handcuffs and compliant . . ."  (Tr. 30).  Blount's phone was found either on his person or in the house.  (Tr. 33).  The officers did not arrest Mr. Wright.  (Tr. 29).

As Eppinette approached the house, he noticed two things:  the odor of marijuana and the open door.  (Tr. 10).  Through the open door, Eppinette was able to observe a printer on a table.  *Id*.  The open door was a concern for Eppinette because, with narcotics sales, people are coming and going, and some have firearms.  (Tr. 17).  Not knowing "who was inside that house, if any, [was] a concern."  *Id*.  Eppinette did not know whether someone would come out shooting, or what their intent was.  *Id*.

Eppinette ordered a protective sweep because, when dealing with narcotics and someone with Blount's criminal history, there always is a chance of people being present that officers are not aware of.  (Tr. 10-11).  In other words, Eppinette was concerned for his safety, officer safety, and Blount's safety.  *Id*.  At that time, Eppinette was not aware of the number of people

7

in the house and had not surveyed or viewed the location prior to executing the warrant. (Tr. 12). Eppinette had not heard any noises coming from the house, observed any movement in the house, or noticed any cars in the driveway. (Tr. 31).

In response to questioning, Eppinette agreed that the following circumstances factored into his decision to order the sweep: Blount's criminal history, the history of narcotics sales, and because a hit had been placed on Blount. (Tr. 18-19). When asked on cross-examination why he believed that someone might be in the house, Eppinette replied, "[b]ecause with the sale of narcotics, there's always in-and-out traffic. We don't know if there's somebody inside or outside. They could be at any time." (Tr. 31). Eppinette conceded, however, that he had no information that narcotics were being sold from the residence at 3210 Dick Taylor Drive. (Tr. 34).

Roughly seven officers participated in the protective sweep, which was completed within about 60 to 90 seconds. (Tr. 15-16). Two officers remained outside with Blount. (Tr. 15-16). The officers went in the front door and cleared the house room by room by checking for places where people could hide, i.e., in the corners, behind closet doors, and under the bed. *Id*. As soon as the sweep was finished, the officers exited. *Id*. During the sweep, the officers observed items that became the basis for the search warrant that was executed later that day. (Tr. 18). However, the officers did not touch or disturb those items during the sweep. *Id*. The officers also did not locate anyone else in the house. (Tr. 31).

Following the protective sweep, the officers applied for a search warrant at 2:52 p.m. (Tr. 31).

**Law and Analysis**

Blount contends that officers violated his Fourth Amendment rights when 1) they used an exigent request "ping" authorization to locate him, the day after any exigency had terminated; and 2) they conducted a warrantless search of his residence, even though they failed to meet all of the requirements for a protective sweep. Therefore, he argues that all evidence seized in this case and any inculpatory statements made by him should be suppressed as "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 485–86 (1963).

**I.    The Fourth Amendment**

"The question that a federal court must ask when evidence secured by state officials is to be used as evidence against a defendant accused of a federal offense is whether the actions of the state officials in securing the evidence violated the Fourth Amendment to the United States Constitution." *United States v. Cordero*, 465 F.3d 626, 630 (5th Cir. 2006). The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. CONST. AMEND. IV. The protections of the Fourth Amendment extend to the states through the Fourteenth Amendment. *Dunaway v. New York*, 442 U.S. 200, 207 (1979) (citation omitted).

"The proponent of a motion to suppress has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights." *United States v. Iraheta*, 764 F.3d 455, 460 (5th Cir. 2014) (citations omitted). However, when, as here, "the government searches or seizes a defendant without a warrant, the government bears the burden of proving, by a preponderance of the evidence, that the search or

seizure was constitutional." *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001) (citations omitted).

Evidence obtained in violation of the Fourth Amendment is generally excluded and "cannot be used in a criminal proceeding against the victim of the illegal search or seizure." *United States v. Wallace*, 885 F.3d 806, 810 (5th Cir. 2018) (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974)). The purpose of this exclusionary rule is to deter unlawful police conduct. By refusing to admit evidence gained as a result of conduct that deprives the defendant of some right, "'the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of the accused.'" *United States v. Pope*, 467 F.3d 912, 916 (5th Cir. 2006) (quoting *United States v. Leon*, 468 U.S. 897, 919 (1984)). Nonetheless, the exclusionary rule is not without limits, and suppression of evidence should be "ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." *Id.*

## II. Use of the Exigency Request to Obtain Blount's Location

The Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701, *et seq.*, governs the privacy of stored electronic communications in the United States. *Alexander v. Verizon Wireless Servs., L.L.C.*, 875 F.3d 243, 249–50 (5th Cir. 2017) (citation omitted).[6] As pertinent

---

[6] Among other things, the SCA

> (1) prohibits unauthorized access to certain electronic communications, *see* 18 U.S.C. § 2701; (2) restricts service providers from voluntarily disclosing the contents of customer communications or records to certain entities and individuals, *see id.* § 2702; and (3) permits a governmental entity to compel a service provider to disclose customer communications or records in certain circumstances, *see id.* § 2703.

*Id.*

here, the SCA authorizes a provider of electronic communications services to

> divulge a record or other information pertaining to a subscriber to or customer of such service . . . to a governmental entity, if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of information relating to the emergency . . .

18 U.S.C. § 2702(c)(4).

The SCA is circumscribed by the Fourth Amendment. In 2018, the Supreme Court considered "how to apply the Fourth Amendment a new phenomenon: the ability to chronicle a person's past movements through the record of his cell phone signals." *Carpenter v. United States*, ___ U.S. ___, 138 S. Ct. 2206, 2217 (2018). The Court held that "an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through [cell-site location information ("CSLI")]." *Id*. Thus, historical location information obtained from an individual's wireless carrier constitutes the product of a search for purposes of Fourth Amendment protection. *Id*. Consequently, the Government generally must obtain a warrant supported by probable cause before acquiring such CSLI records. *Id*.

"In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." *Carpenter*, 138 S. Ct. at 2221 (quoted source omitted). The Court added that,

> [o]ne well-recognized exception applies when the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment. Such exigencies include the need to pursue a fleeing suspect, *protect individuals who are threatened with imminent harm*, or prevent the imminent destruction of evidence.
>
> As a result, if law enforcement is confronted with an urgent situation, such fact-specific threats will likely justify the warrantless collection of CSLI.

*Id*. (internal citations and quotation marks omitted) (emphasis added); *see also United States v. Boukamp*, 551 F.Supp.3d 704, 711–12 (N.D. Tex. 2021) (*Carpenter* clearly recognized an

exception for warrantless searches of CSLI pursuant to exigent circumstances).

In this case, DEA Agent Marionneaux obtained credible information that Blount was in imminent harm of death or serious bodily harm. Accordingly, he filled out an exigency request to obtain Blount's location information with Blount's cell phone provider. The court finds that Marionneaux's actions were authorized under the SCA and consistent with the Supreme Court's recognition of exigency exceptions to the warrant requirement in *Carpenter*. *See Boukamp,* 551 F. Supp.3d at 712 (while CSLI was requested and received without a warrant, the search was reasonable because law enforcement complied with the requirements of both the Fourth Amendment and § 2702(c)(4)). Marionneaux, in turn, forwarded the CSLI to his counterpart at the MPD, who represented the local law enforcement office where Blount was located.

Blount disputes whether there was a clear threat to his life, but, even if there were such a threat, he contends that MPD transgressed its limited authorization under the SCA and the Fourth Amendment when it accessed Blount's CSLI – *after* the threat on his life had been neutralized. Blount points out that if a threat on his life was so imminent that it justified an exigency request to the cell provider, then the MPD should not have waited until the next day to act on the information. Further, he contends that the failure of officers in Baton Rouge to communicate to Cox, Eppinette, and MPD that the threat had been neutralized cannot support a good faith exception.

First, the undesigned finds that Marionneaux acted reasonably and at the risk of his own investigation in seeking the CLSI based on a credible and imminent threat that either Blount's life was in danger or that he was in danger of suffering serious physical injury. Having demonstrated that exigent circumstances existed to the degree necessary, Marionneaux properly obtained the ping information under the SCA and consistent with the bounds of the Fourth Amendment. Thus, any initial search of Blount's CLSI on October 14th, though warrantless,

was reasonable.

In each "urgency situation," the court is concerned with the specific facts of the "threat" to determine whether a warrantless search is justified. *Carpenter*, 138 S. Ct. at 2222. *Carpenter* was clear that officers are not limited in their "ability to respond to an ongoing emergency." *Id.* By October 15th, however, the exigency had ended and there was no "ongoing emergency." Contrary to the Government's suggestion, the recordings did not raise a reasonable possibility that someone else had been enlisted to eliminate or pressure Blount. Certainly, the person is recorded discussing his intent to gain more information, but there was nothing in the recordings to indicate that another person intended to assist in harming Blount or that such person would take up the mantle if the original threat were neutralized.[7] Therefore, any collection of CLSI on October 15th, after the emergency ended, was not reasonable and constituted a warrantless search under the Fourth Amendment for which there was no exception.[8]

However, the exclusionary rule is not appropriate where, as here, officers acted in good faith, i.e., "in objectively reasonable reliance upon a statute . . ." *United States v. Wallace*, 885 F.3d 806, 810 (5th Cir. 2018) (quoting *Illinois v. Krull*, 480 U.S. 340, 342, 107 S. Ct. 1160, 94 L.Ed.2d 364 (1987)); *see also Alexander*, 875 F.3d at 253-254. Marionneaux selected the

---

[7] In addition to listening to the recordings in Court, the undersigned has again listened to the recordings provided. At least two of those recordings appear to be calls between the person who made the threat and persons in south Louisiana. The other two calls appear to be between the person who made the threat and persons in the Monroe area. (Exhibits 3-6). However, even the persons in the Monroe area do not indicate their intent to seek out Blount, to harm him, or to assist the person making the threat, other than by attempting to call Blount or to provide his location.

[8] Certainly, the undersigned cannot say that by the time of Blount's arrest on the afternoon of October 15th that the "exigencies of the situation ma[d]e the needs of law enforcement so compelling that a warrantless search" was reasonable. *Carpenter*, 138 S. Ct. at 2221.

option on the T-Mobile request form that authorized the disclosure of continuous location information in 15-minute intervals for **48** hours. (Gov.'t Suppl. Exh. # 1). Eppinette did not exceed that authorized time limit. Further, there is no evidence that Cox or Eppinette had been informed that the threat to Blount had ended prior to any CLSI ping or search on October 15th and thus had no reason to know that their use of the ping data violated the statute. Ultimately, there is no evidence that Eppinette, Marionneaux, or any other officer acted in bad faith[9] or adopted an objectively unreasonable interpretation of the exigency exception authorized by the SCA. *See Wallace,* 885 F.3d at 810-11. In the absence of controlling caselaw that prohibits the Government from obtaining the CSLI under the instant circumstances, it was reasonable for the officers to rely on the statute.[10] *Id*. For these reasons, the undersigned recommends that the Motion to Suppress be DENIED as to Blount's claim that the warrantless search of his CLSI was unconstitutional.

### III. The Protective Sweep

"[W]hen it comes to the Fourth Amendment, the home is first among equals. At the Amendment's very core stands the right of a man to retreat into his own home and there be free

---

[9] Marionneaux credibly testified that he did not believe that Cox or Eppinette had been informed that the person had been intercepted.

[10] Eppinette's testimony on the number of times and the dates that MPD accessed Blount's CLSI is not a model of clarity. He testified that he does not remember how many times officers pinged Blount's location, but it "could have been once or twice." (Tr. 14). However, reading all of his testimony from the two hearings together, it appears that Blount's location was pinged on October 14th and 15th. Eppinette, when being questioned by Blount's counsel, agrees that he would have pinged Blount's "very soon" after obtaining the information on October 14th. (Tr. 15). In other testimony, he explains that officers went to the Dick Taylor address and saw Blount on the front porch between 15 and 25 minutes after they pinged his location. (Tr. 12). Assuming officers "pinged" Blount's location on October 14th, they lawfully obtained the Dick Taylor address and could simply have gone to that address and executed the arrest warrant for him the following day. In other words, the October 15th "ping" would merely have confirmed the lawfully obtained location.

14

from unreasonable governmental intrusion." *Florida v. Jardines*, 569 U.S. 1; 133 S.Ct. 1409 (2013). Nevertheless, an otherwise unconstitutional intrusion into a residence may be excused by exigent circumstances such as the pursuit of a suspect, the loss of evidence, and the immediate safety risk to officers. *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001) (citation omitted).

In this case, the officers entered and searched the residence without a warrant for purposes of conducting a protective sweep, whereupon they observed, in plain view, evidence of counterfeiting and other crimes. *See* Def. Post-Hearing Memo., pg. 2; Def. Reply Memo., pg. 2. Indeed, "[o]nce the officers are legally inside the [residence], any evidence or contraband that is in plain view is subject to seizure and may be admitted into evidence." *United States v. Jackson*, 700 F.2d 181, 189 (5th Cir. 1983) (citing *Harris v. United States,* 390 U.S. 234, 236, 88 S.Ct. 992, 993 (1968)).

The protective sweep doctrine represents a "well-delineated" exception to the warrant requirement.[11] *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093 (1990). "A protective sweep is a quick and limited search of premises . . . conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id.* at 327 (internal quotation marks omitted). However, there is no "general security check" exception to the warrant requirement. *Kirkpatrick v. Butler*, 870 F.2d 276, 281 (5th Cir. 1989) (citation omitted).

A valid protective sweep requires the following:

---

[11] The protective-sweep exception is analytically distinct from the exigent-circumstances exception. *United States v. Thurman*, No. 21-30450, 2022 WL 2805147, at *3 n.5 (5th Cir. July 18, 2022), *cert. denied,* 214 ___ U.S. ___; 143 S.Ct. 750 (2023).

15

> First, the police must have entered legally and for a legitimate law enforcement purpose.
>
> Second, the officers must have a reasonable, articulable suspicion that the area to be swept contains a person posing a danger to those on the scene.
>
> Third, the protective sweep must be limited to a cursory inspection of only those spaces where a person may hide; it is not a full search of the premises.
>
> Finally, officers must conclude the sweep once they have dispelled their reasonable suspicion of danger, and they may not continue the sweep after they are no longer justified in remaining on the premises.

*United States v. Mata*, 517 F.3d 279, 286 (5th Cir. 2008) (citation omitted) (footnotes removed).

When assessing whether a protective sweep is justified, the court considers the totality of the circumstances surrounding the officers' actions. *United States v. Silva*, 865 F.3d 238, 241–42 (5th Cir. 2017) (citation omitted). Ultimately, however, "[i]f reasonable minds could differ on [ ] whether the sweep was warranted, [the court will] not second-guess the judgment of experienced law enforcement officers concerning the risks in a particular situation." *Id*. (citation omitted).

As an initial matter, the court finds that the MPD officers were at the subject residence for a legal and legitimate law enforcement purpose: they possessed an active warrant for Blount's arrest. While Blount contests the accuracy of some of his criminal history set forth in the search warrant application, he does not seriously dispute that the arrest warrant otherwise is supported by probable cause. Furthermore, the officers legally had obtained Blount's location via the exigency request ping provided by Blount's cell provider. *See* discussion, *supra*.

The court further finds that, in this case, the sweep was limited to areas where an individual could have hidden and lasted no longer than necessary. The officers observed the

items in plain view, which then became the basis for the search warrant that they obtained and executed that same day.[12] The MPD completed the sweep within 90 seconds, and the officers promptly exited the residence, thereafter.

Therefore, the determinative issue becomes whether the officers had a reasonable, articulable suspicion that the area to be swept, i.e., the residence, contained a person posing a danger to those on the scene. Blount contends that suppression is mandated pursuant to *United States v. Menchaca-Castruita*, where the court declined to find exigent circumstances because the officer had no articulable reason to believe that someone might be inside the residence, despite the officer's belief that 1) there was drugs in the home, 2) the possibility that someone else might be inside, and 3) that firearms often are the "tools of the trade," for drug traffickers. *United States v. Menchaca-Castruita*, 587 F.3d 283, 295 (5th Cir. 2009).[13]

The undersigned acknowledges that there are some similarities between this case and *Menchaca-Castruita*. In an earlier case, however, the Fifth Circuit upheld a protective sweep where the officer who made the protective sweep conceded that "he lacked specific reason to

---

[12] The Government did not introduce into evidence the search warrant, the search warrant application, or the search warrant return.

[13] In *Menchaca-Castruita*, the court emphasized that,

> [t]here will always be some *possibility* that an unknown person might be hiding somewhere inside a residence, waiting for an opportunity to attack law enforcement officers or to destroy evidence. A finding of exigent circumstances, however, must be based on *more than a mere possibility*; it must be based on an officer's reasonable belief that the delay necessary to obtain a warrant will facilitate the destruction or removal of evidence or put officers or bystanders in danger.

*Id*. (emphasis added).

17

believe other individuals were in the house but that the possibility always exists." *United States v. Watson*, 273 F.3d 599, 601 (5th Cir. 2001). In another decision, the Fifth Circuit found no Fourth Amendment violation where the DEA agent conducted a security check of a motel room when the defendant was arrested outside the front door, and the agent had a reasonable, but unarticulated suspicion that someone else might have remained in the motel room. *United States v. Sheikh*, 654 F.2d 1057, 1072 (5th Cir. 1981), *overruled on other grounds by United States v. Zuniga-Salinas*, 952 F.2d 876 (5th Cir. 1992)).

Likewise, in *United States v. Jackson*, the Fifth Circuit found that agents had a reasonable belief that an immediate security sweep of the premises was required because they did not know whether the two suspects who had left the room were the only remaining people involved in the exchange. *United States v. Jackson*, 700 F.2d 181, 190 (5th Cir. 1983).

In still another decision, the Fifth Circuit held that where the defendant was arrested just outside of his home, a protective sweep was permissible to dispel the possibility that another individual was inside the home who might pose a threat to the officer's safety. *United States v. Stout*, 339 Fed. App'x. 377, 378 (5th Cir. 2009) (citations omitted). Furthermore, the Fifth Circuit found no Fourth Amendment violation where officers decided to conduct a sweep of a storage unit to allay their "concern" that someone else might be hiding there, even though the defendant was arrested outside of the storage unit. *United States v. Charles*, 469 F.3d 402, 406 (5th Cir. 2006).

In this case, Officer Eppinette decided to order a protective sweep because he was concerned for his safety, officer safety, and Blount's safety. The front door was open, and Eppinette did not know the number of people in the house because he had not surveyed it or

viewed the location prior to executing the warrant. Eppinette further noted Blount's criminal history, the history of narcotics sales, and that a hit had been placed on Blount.[14]

Finally, while not emphasized by Eppinette, the MPD had an address for Blount somewhere on Roggerson Road. *See* Tr. 20. Eppinette learned from Marionneaux that a family member of Blount lived at the Dick Taylor residence where they ultimately found and arrested him. (Tr. 25, 47). Accordingly, it was reasonable for the officers to suspect that someone else, e.g., Blount's family member,[15] could be inside. *See Thurman, supra* (court considered other objective circumstances not emphasized by the officers to support the sweep).

In the end, where, as here, reasonable minds could differ as to whether the sweep was warranted, the court will not second-guess the judgment of experienced law enforcement officers concerning the risks in a particular situation. *United States v. Thurman*, 3:19-CR-00398-01, 2020 WL 7346614, at *4 (W.D. La. Dec. 11, 2020), *aff'd,* 21-30450, 2022 WL 2805147 (5th Cir. July 18, 2022) (citation omitted). Therefore, the court finds that the protective sweep did not transgress the Constitution and the officers were permitted to seize the contraband that they observed in plain view.

## IV. Inculpatory Statements

Blount also seeks to suppress any inculpatory statements that he made as fruit of the poisonous tree. However, the undersigned has determined that there was no antecedent constitutional violation, and, thus, any "fruit" remains unadulterated. In addition, the parties did

---

[14] Recall that Eppinette did not know that the person who had threatened Blount had been intercepted en route.

[15] There is no indication that Mr. Wright was related to Blount.

not address any inculpatory statements made by Blount. Consequently, the undersigned is unable to render an opinion regarding the admissibility of any such statements.

## Conclusion

For the above-stated reasons,

IT IS RECOMMENDED that the motion to suppress [doc. # 27] filed by Defendant, Allen Blount, be DENIED.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen(14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 25th day of July, 2023.

KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE